Justice LEEDS,
concurring in part, dissenting in part.
Petitioners are required to meet a two-part test. First, they must show beyond a *70 reasonable doubt that substantial violations of Cherokee election law occurred. Second, they must demonstrate that such violations either affected or had a strong likelihood of affecting the election outcome. 26 C.N.C.A. § 102(C). I would hold that Petitioners have met their burden as to several provisions of Title 26 and that such violations had a strong likelihood of affecting the election results in the Tribal Council elections for districts one, three and six, as follows:
1. Petitioners established beyond a reasonable doubt that the election commission failed to keep the voter list current as required by 26 C.N.C.A. § 11(D)(6). Petitioners produced evidence that two deceased tribal members were registered to vote in this election. One of the individuals died two years prior to the 1999 election. 26 C.N.C.A. —— 24(B) requires the election commission to remove deceased members from the Qualified Voters Lists. Although there was no evidence that anyone fraudulently voted in place of the decedents, the violation should be considered cumulatively with all other irregularities.
2. Petitioners proved beyond a reasonable doubt that at least one member of the United Keetoowah , Band (UKB) who had relinquished membership in the Cherokee Nation in December 2002 voted in this election in violation of 26 C.N.C.A. § 21(A)(1) and 26 C.N.C.A. § 24(B) which requires the election commission to remove “disenrolled” persons from the Qualified Voters Lists. Rather than refute the testimony, a Commissioner indicated that at least 10 other individuals had relinquished membership a short time before the election, two of which were found to be on the registered voter’s list. One of the two was attributable to district one, the other voter is unidentified. The Tribal Council passed an emergency measure in May of 2002, effective immediately, setting a reducing window for holding relinquishment request from 180 to 60 days. Therefore, all individuals relinquishing tribal membership prior to March 24, 2002, were not tribal members and should not have been on the current voter’s list. This violation should be considered cumulatively with all other irregularities.
3. Petitioners proved beyond a reasonable doubt that absentee ballot request were received after the cut-off date. 26 C.N.C.A. § 73(A) permits request for absentee ballots to be made until the second Friday in April, or in this case, April 11, 2003. Absentee ballots are to be mailed in a two day period starting the last Monday in April, or in this case, April 28, 2003. Any ballots requested out of time, or mailed out of time violate the Cherokee election laws. The Commission admits that eleven (11) poll workers were given absentee ballots outside the structure provided for in statute. Nine of these poll workers voted at a pre-election workshop. Two of these poll workers voted on May 23rd at the election commission office. Further, the Commission admits that three individuals, none of which were poll workers, were given absentee ballots at the Commission office, on election day. The eleven poll worker ballots can be attributed to individual districts. This violation should be considered cumulatively with all other irregularities.
4. Petitioners proved beyond a reasonable doubt that in some cases, re *71 placement ballots were mailed out to absentee voters who should have otherwise received ballots in the oi’iginal April 28 mailing. The Commission concedes this point and provided the Court a list of voters receiving replacement ballots. The replacement ballots violate 26 C.N.C.A. § 73 C which prohibits more than absentee ballot request per individual signature for each election date. Although the Commission acted in good faith in trying to accommodate voter’s request, it was nonetheless a violation of Cherokee election law to do so. By the Commission’s admission, there were fifty-two (52) replacement ballots mailed out after the time permitted by statute. The fifty-two replacement ballots can be attributed to individual districts. This violation should be considered cumulatively with all other irregularities.
5. Petitioners proved beyond a reasonable doubt that, in seven instances, the exterior envelopes of incoming absentee ballots, contained no notary, as required by 26 C.N.C.A. § 91(A). Although a result of human error, the seven ballots were counted when they should not have been and this constitutes a violation of Cherokee election law. The seven envelopes were examined by the Court and can be attributable to specific districts. This violation should be considered cumulatively with all other irregularities.
6. Petitioner proved beyond a reasonable doubt that at least two individuals, who voted in the 1999 election and testified they were registered to vote, were not allowed to vote in this election. Neither individual had a red voter identification card, but such card is not required under Cherokee election law. However, both individuals testified that they were turned away at the polls despite the fact that they were tribal members, who had voted in the previous election. The Commission did not attempt to refute this testimony. The two'voters- can be identified by district. This violation should be considered cumulatively with all other irregularities.
7. Although less identifiable to a specific subsection of Title 26, there are other irregularities proven by Petitioners that require further attention. Upon the Justices’ examination of the absentee ballot exterior envelopes, thirty (30) secrecy envelopes were found in the “counted” containers. The envelopes had been cut open, and presumably, a ballot removed for counting. Although the exterior envelopes are to be kept separately from the these interior secrecy envelopes, these thirty were not. The Commission explained that they inadvertently must have place the secrecy envelopes in the container with the exterior envelopes. Petitioners argue that the thirty envelopes represent yet another irregularity that must be considered cumulatively with all other irregularities. I agree.
8. On day three of the trial, after the Justices’ examination of the absentee ballot envelopes, the Court ordered that thirty (30) ballots, that were improperly excluded from counting in the first instance, be counted for the record. One of these ballots was in an envelope that was signed by a district court judge, rather than a notary public. The Court deemed the signature of the district court judge appropriate, in *72 light of the signature line on the envelopes that permit either a notary, clerk or judge, to attest. One of the ballots was found in an envelope that was properly notarized, yet the ballot was inadvertently overlooked and not counted in the original count. The remaining twenty-eight (28) ballots appeared to the Court to be properly signed by a notary, with proper commission dates, but lacking a notary seal or stamp. The Court adopted a liberal approach to allow all ballots with proper notary signatures to be counted in order that the fewest number of Cherokee voters be disenfranchised. The results from the count of these thirty (30) ballots adjusted the totals of the election.
9. On the day of the recount, the Commission counted 22 more ballots than envelopes, and this Court took judicial notice of the difference at the recount and on several occasions during this trial. Whether it was human error in counting the envelopes or whether somehow the number of ballots exceeded the number of envelopes, an irregularity occurred. In the final recess before announcing the decision, in light of the extremely close races in District 1, 3 and 6, the Court carefully counted the absentee envelopes again. The Court’s count was 5751 envelopes. Although the Court’s count produced 17 more envelopes than the Commission’s 5734 count during the recount proceedings, there are still at the very least 5 more ballots than envelopes. Further, given the vast difference between the Court’s count and the Commission’s count, a third or fourth count might very well produce further discrepancies. It is for this reason, I would give light to the Commission’s findings at a recount equal weight to the Court’s counting on the last day of trial.
I concur with the majority, as I joined in sustaining the demurrer, as to several of Petitioners allegations. I find absolutely nothing improper as to the voter’s list alleged distributed by the Smith campaign. Although Commissioner Adair testified, as to form, that it looked like the form the election commission maintained, the testimony of ever other witness, for both sides, leads me to believe the list did not originate in the election commission. No witness could identify what the “voter id” number in the final column represented. It clearly is not a Cherokee Nation registration number; it clearly is not a number that appears on red voter identification cards distributed by the Election Commission; and it clearly is not the five digit bar code assigned by the Automated Election Service.
I also concur that the Petitioners did not meet their burden of proof with respect to checking photo identifications at the polls. Here, Cherokee law is in conflict. 26 C.N.C.A § 62(B) simply stated that any registered voter may vote by appearing at their precinct, announcing to the official their name, and singing the registry. There is no requirement that the voter show a photo identification. 26 C.N.C.A. § 12(C) makes it a duty of the precinct board member to ascertain the identity of voters, either through personal knowledge or photo identification. It is insufficient to meet the requisite burden of proof for this alleged irregularity by the testimony of voters going to the polls that were not asked for their ill. It is subjective to the precinct worker whether they know the voter.
Finally, I concur that the Petitioners failed to meet their requisite burden to *73 establish a violation of late registration of voters. Mr. Sanders testified that he saw approximately one dozen voters being registered at the polls in District 8, that the individuals were allowed to vote, and their ballots were place in envelopes. This is consistent with the procedure for challenge ballots under Cherokee election laws.
The phrase “mathematical certainty” has been commonly mentioned in this case, and requires some discussion. Section 102(B) defines only the burden of proof and makes no mention of mathematical certainty. It requires the Court to make a determination as to whether the irregularities proven affected the election or had a strong likelihood of affecting the election. However, common sense dictates that to decide whether an election is affected or whether there is a strong likelihood the election was affected, the Court must necessarily engage in some mathematical calculations.
District 1, 3 and 6 present similar inquiries. Unlike the chief and deputy chief races where ultimately one candidate is elected by a majority vote, these district elect the top two vote winners. If it is found that the outcome of one of these districts is in question, then the all candidates in the district should be placed back on the ballot because there is no provision for run-offs in these districts.
In District 1, fourteen (14) candidates ran for office. Baker received 825 votes and Smoke-Connor received 802 votes to become the uncertified winners. The third place finisher, Martens, received 744 votes. Therefore, a differential of 58 votes would, in fact, affect the outcome of the election. A total of 5737 votes were cast in District 1.
The irregularities that must, at the very least, be attributed to District 1 include: (1) somewhere between 5 and 22 more absentee ballots than envelopes; (2) one former tribal member who voted at Sequo-yah High School; (3) at least one other former tribal member who’s voting precinct was not established; (4) at least one registered voter, Mr. Foreman, who was turned away at Sequoyah High School; (5) 11 of the 52 replacement ballots; (6) 3 of the precinct workers who voted at the workshop; (7) one individual who was given an absentee ballot on election day; (8) 3 precinct workers who voted on the 23rd or 24th; (9) 5 of the 30 secrecy ballots. Although there is no way to be absolutely certain of the number, these irregularities constitute a probable range of 30 to 47 votes.
In District 3, Yargee and Thornton were the uncertified winners, receiving 576 and 574 votes, respectively. The third place finisher, Bush, received 538 votes. Therefore, a differential of 36 votes would, in fact, affect the outcome of the election. A total of 2628 votes were cast in District 3.
The irregularities that must, at the very least, be attributed to District 3 include: (1) somewhere between 5 and 22 more absentee ballots than: envelopes; (2) at least one former tribal member who’s voting precinct cannot be established; (3) 4 of the 52 replacement ballots; (4) 3 precinct voters that voted at the workshop. Although there is no way to be absolutely certain of the number, these irregularities constitute a probable range of 12 to 29 votes.
In District 6, Frailey and Keener were the uncertified winners, receiving 353 and 341 votes, respectively. The third place finisher, Wickliffe Shepherd, received 313 votes. Therefore, a differential of 28 votes would, in fact, affect the outcome of the election. A total of 1614 votes were cast in District 6.
The irregularities that must, at the very least, be: attributed to District 6 include: *74 (1) somewhere between 5 and 22 more absentee ballots than envelopes; (2) at least one former tribal member who’s voting precinct cannot be established; (3) 1 of the 52 replacement ballots; (4) one tribal member, Ms. Sandra Turner, who tried to vote at the Salina Clinic and was turned away. Although there is no way to be absolutely certain of the number, these irregularities constitute a probable range of 6 to 24 votes.
There is no way to know with mathematical certainty which candidate would receive the vote of a voter turned away from polls. Likewise, there is no way to appropriately subtract votes that were cast with illegality or irregularity. Therefore, I would reduce the highest number in the ranges provided above from the second place candidate to determine whether the outcomes of the election would change, or whether there is a substantial likelihood of that change.
In District 1, there was a margin of 58 votes from which I would subtract at least 47 votes for this inquiry to leave a margin of 11 or fewer votes. In District 3, there was a margin of 36 votes from wdiich I would subtract at least 29 votes for this inquiry to leave a margin of 7 or fewer votes. In District 6, there was a margin of 28 votes from which I would subtract at least. 24 votes for this inquiry to leave a margin of 4 or fewer votes. With each of these subtractions, I note that these are the areas of irregularities I can assign hard numbers to, while there are remaining irregularities that are impossible to assign actual numbers.
In District 1, 11 or fewer votes out of a total vote count of 5731 represents less than two tenths of one percentage point. In District 3, 7 or fewer votes out of a total vote count of 2628 represents approximately one quarter of one percent. In District 6, 4 votes out of a total vote count of 1614 represents less than one quarter of one percent. These small margins, taking into consideration that there are other irregularities that go without an identifiable number, lead me to conclude that there is a substantial likelihood that the outcome of the elections for these three districts was affected. The Cherokee people deserve to be certain that irregularities did not contribute to the election of their representatives.
As for the races for Chief and Deputy Chief, I concur with the majority. In the best light, we can contribute 130 irregularities with relative certainty. Even if that number were subtracted from Chief Smith and reassigned to Petitioner Byrd, which would doubly compensate, the margin would not change the outcome of the those elections.
In conclusion, I wish to commend the Election Commission for their countless hours of hard work. The Election Commission acted, in all times, in perfectly good faith, yet mistakes were made and irregularities of the Cherokee election laws occurred. Future legislation is needed to help clarify the conflicting laws and make accommodations for issues that will undoubtedly arise in subsequent elections.
EXHIBIT “A”
FINAL TABULATION OF VOTES CHEROKEE NATION GENERAL ELECTION
May 24, 2003
As Amended by Recount on May 30, 2003 and
Litigation in JAT 03-08, JAT 03-09
As Ordered on June 17, 2003
Principal Chief Vote % Council Member—District 4 Vote %
*75 [[Image here]]